UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

THE ESTATE OF LOUISE                                    CIVIL ACTION
CHRISTMAN

VERSUS

LIBERTY MUTUAL INSURANCE                    NO. 20-00739-BAJ-RLB
COMPANY

RULING AND ORDER

Before the Court is Defendant Liberty Mutual Insurance Company's ("Liberty") **Motion For Summary Judgment (Doc. 40)**, which seeks dismissal of all claims asserted by Plaintiff The Estate of Louise Christman (the "Estate"), or, alternatively, partial summary judgment on the Estate's claims of bad faith insurance practices. The Estate opposes Liberty's Motion. (Doc. 46). For reasons to follow, Liberty's Motion will be granted, and the Estate's action will be dismissed with prejudice.

I.    BACKGROUND

This is a homeowners insurance dispute. The following facts are drawn from Liberty's Statement Of Undisputed Facts (Doc. 40-2, "Liberty's SOF"), the Estate's Response To Liberty Mutual's Statement Of Undisputed Facts (Doc. 46-1, "Estate's Response SOF"), and the parties' Joint Pretrial Order (Doc. 71, "Joint PTO"), as well as the record evidence submitted in support of these documents.

Liberty issued Louise Christman a homeowners policy (No. H3229100370260, the "Policy") protecting Mrs. Christman's home in Lake Charles, Louisiana. The Policy provides a dwelling damage coverage limit of $643,300, subject to a $12,866

deductible, and generally includes coverage for direct damage caused by hailstorms and hurricanes. (*Id.* at § F(1)-(2)). Relevant here, however, the Policy *excludes* coverage for damage caused by wear, tear, and deterioration, and mechanical breakdown. (*Id.*). In full, the Policy's "wear and tear" provision states:

> **SECTION I – PERILS INSURED AGAINST**
>
> **COVERAGE A – DWELLING and COVERAGE B – OTHER STRUCTURES**
>
> We insure against risk of direct loss to property described in Coverages A and B only if that loss is a physical loss to property. We do not insure, however, for loss:
>
> . . .
>
> 2. Caused by:
>
> …
>
> e. Any of the following:
>
> (1) Wear and tear, marring, deterioration;
>
> (2) Inherent vice, latent defect, mechanical breakdown[.]

(Doc. 40-3 at 14).

On May 26, 2020, during the policy period, a wind and hailstorm passed through Lake Charles. (Joint PTO at § F(3)). At the time of the storm, the asbestos tile roof covering Mrs. Christman's main dwelling was approximately 60 years old. (*Id.*).

On June 1, 2020, James Christman—Mrs. Christman's son—reported a loss under the Policy to Liberty, asserting that the May 26 storm caused damage to Mrs. Christman's roof and her backyard fence. (*Id.* at § F(4)). Liberty promptly dispatched Fourseventy Claim Management ("FCM"), an independent claim inspection and adjusting firm, to perform an inspection. (*Id.* at § F(5)).

On June 2, 2020—one day after James Christman reported the claim—FCM inspector Daniel Guilbeau inspected Mrs. Christman's property. (*Id.* at § F(6). Inspector Guilbeau's June 2 inspection resulted in a 67-page Report, complete with dozens of pictures depicting various parts of Mrs. Christman's property, including pictures of (1) the asbestos tile roof covering the main dwelling, (2) the three-tab shingle roof covering the pool house, and (3) the fence. Approximately twenty pictures depict "broken tile" at the main dwelling. (*See* Doc. 46-4 at pp. 23-42). The "Inspection Notes" accompanying these pictures state:

> Roof is comprised of slate tile. All four directional slopes had damage possible from hail and/or tree limbs. Unable to walk roof due to brittleness of tile Shingles. Inspection performed via ladder and fire escape, able to see all damage from various positions.

(Doc. 46-4 at p. 42).

By contrast, pictures of the pool house roof show "blistering" shingles "due to no ventilation," but no hail damage. (*Id.* at pp. 56-62).  The notes accompanying these pictures state, "No damage found to pool house." (*Id.* at p. 66).

Finally, the Report includes two pictures of Mrs. Christman's downed fence, accompanied by notes stating "25 linear feet of fence damaged." (*Id.* at pp. 64-66).

On June 10, 2020, eight days after receiving Inspector Guilbeau's Report, Liberty denied coverage of Mrs. Christman's claim to roof damage, citing the Policy's "wear, tear, and material breakdown" exclusion. (Joint PTO at § F(7)).[1] In relevant part, Liberty's June 10 denial letter stated:

---

[1] By contrast, Liberty extended coverage to Mrs. Christman's downed fence. (Joint PTO at § F(7)).  Yet, because the replacement cost of the fence ($1,081.77) was less than the Policy's deductible ($12,866.00), Mrs. Christman recovered nothing. (Doc. 40-5 at p. 251).

No damage to Detached structure's 3-tab shingles.*

Damage to tile roof appears to be related to wear and age of the tiles.*

(Doc. 40-5 at p. 249).

In a follow-up phone conversation to James Christman, also on June 10, 2020, Liberty's adjuster Stephan Vaneau further explained the basis of Liberty's denial of coverage for the roof. (*See* Doc. 40-5 at 262-63). Liberty's "claim notes" of this conversation reflect the following:

> [E]xpl [sic] the damage to the roof's tile appear [sic] to be related to wear and tear caused by the age of the roof – it is common to see chipping on tiles [sic] roofs, especially at pressure points where tiles converge – this is due to the constant pull of gravity on these tiles or moisture intrusion that expands and causes cracking – this concept of wear related damages is furthered by the fact that a nearby detached structure has older 3-tab comp [sic] shingles that were documented as undamaged by the storm where one could reasonably assume that a hail [sic] large and dense enough to damage a tile roof would also cause dmg [sic] to an asphalt roof on the same property.

(*Id.*). Mr. Vaneau's notes further reflect that Mr. Christman was "not pleased" with Liberty's explanation, "as he believe[d] the dmg [sic] to the roof tiles was caused solely by the hail." (*Id.* at 262). Finally, Liberty's notes show that Mr. Vaneau informed Mr. Christman that he could challenge Liberty's denial of coverage, stating that Liberty would adjust its estimate if Mr. Christman engaged "a roofer [to] go out and determine there is storm dmg [sic] to the roof disputing my findings." (*Id.*).[2]

On July 10, 2020, Mrs. Christman passed away. (Doc. 9 at ¶ 3). Mrs. Christman's interests are now represented by the Estate, through its Executor James

---

[2] At his deposition, Mr. Vaneau affirmed this account of his June 10 conversation with Mr. Christman. (Doc. 40-5 at 75-79, 117). At his deposition, Mr. Christman did not dispute that this June 10 conversation occurred, but could not "recall" the details. (Doc. 40-4 at 53-55).

Christman. (*See id.*).

Unhappy with Liberty's denial of Mrs. Christman's roof damage claim, James

Christman engaged a roofer, Shawn McRay, to conduct an independent inspection of

the main dwelling's tile roof.  On July 22, 2020—six weeks after Liberty's June 10

denial—Mr. McRay emailed Liberty eight additional photographs purporting to show

hail damage to the main dwelling's roof, accompanied by a written estimate to replace

the entire roof for $22,340.37. (Joint PTO at § F(8)). Mr. McRay's July 22 email stated:

> Good morning Stephan [sic] please see attached the roofing estimate on
> 809 Henrietta Ln. This property has apparent hail damage throughout.
> The tile roof and shingles have been compromised. The tiles are broke
> [sic] from hail hits and each facet of entire roof has been damaged with
> hits. Im [sic] re-roofing every home around the insured, the area was hit
> bad. Its [sic] my professional opinion that the roof should have a re-
> inspection and be replaced. Thanks. Shawn McRay/project manager

(Doc 46-14 at p. 6). After receiving Mr. McRay's July 22 email, Liberty attempted to

schedule a re-inspection of the Christman property. (*See* Liberty's SOF at ¶ 36;

Estate's Response SOF at ¶ 36).

The parties dispute what happened next. Liberty contends that it "immediately

began the process of scheduling a re-inspection of [the Christman] property with Mr.

McRay present," as requested by James Christman. (Liberty SOF at ¶ 34). In support

of this assertion, Liberty cites deposition testimony of Mr. Vaneau, in which Mr.

Vaneau explained that in the weeks after he received Mr. McRay's email, he made

multiple attempts to schedule a date for the re-inspection, but was unsuccessful

because "the insured didn't want it or the attorney [for the insured] didn't want it

done at the time":

> I remember there was some dispute later in the claims process where, I

5

guess, it was the insured or the attorney of the insured that wasn't sure whether or not they wanted us to perform a re-inspection. A lot of that had to do with the fact that they wanted their contractor to perform an inspection prior to us doing it with the contractor present. I know there was some concern initially with setting up a re-inspection because the insured didn't want it or the attorney didn't want it done at the time.

(*See* Doc. 40-5 at p. 123-24).

Liberty's claim notes corroborate Mr. Vaneau's testimony, showing that between July 28 and August 25, 2020 Liberty made approximately one dozen phone calls to the Estate and its representatives, including Mr. McRay and the Estate's attorney. (*See* Doc. 40-5 at pp. 258-61). Many of Liberty's phone calls went unanswered. Alternatively, when Liberty managed to get through, the Estate, Mr. McRay, *and* counsel created delay in the re-inspection process, such as when, on August 5 and August 8, the Estate twice scheduled re-inspections but thereafter cancelled, (i*d.* at 260); and when, on August 14, Mr. McRay stated that "he did not know if the insured wanted another adjuster to look at the property," and that, in any event, he (Mr. McRay) was unavailable for a re-inspection because he was attending a motorcycle rally in Sturgis, North Dakota, (*id.* at 259); and when, on August 24, the Estate's attorney said that "she could not talk because she had court," (*id.* at 258); and when, on August 25, the Estate's attorney stated that she "would like her contractor to perform an inspection prior to an IA going out there" and "[would] contact the [adjuster] to set up the inspection next week," (*id.* at 258; *see also* Liberty SOF at ¶ 36; Estate's Response SOF at ¶ 36).

The Estate, in turn, points the finger back at Liberty, suggesting that a re-inspection could not be scheduled because *Liberty* was unresponsive, and because the

Estate did not trust Liberty to conduct an accurate re-inspection after Liberty assigned the task to its original inspector, Mr. Guilbeau. (Estate's Response SOF at ¶¶ 34-35). In support of these assertions, the Estate relies primarily on Mr. McRay's deposition testimony, in which Mr. McRay expressed a generalized mistrust of Liberty's "fishy" adjustment procedures, stating:

> What it boiled down in my mind is there's no need for -- you know, there's not even a need for re-inspection if you're gonna send the same guy out. And seeing how he handled it with the homeowner -- you know, Jim [James Christman] enlightened me. You know, I wanted to know what happened, how it went down, and just -- I been on hundreds of 'em, and it just -- it was fishy, and it's unprofessional, and, you know, trying to get the same guy out on the property to get a different thing, uh -- you know, it was. I think at one time now he can walk the roof better, or -- you know, I can't remember exactly, it's been months since Jim told me how that went down. But it was fishy.

(Doc. 46-15 at pp.143-44).

In any event, the parties agree that fate intervened before they could set a date for the re-inspection. On August 27, 2020 Hurricane Laura slammed the Louisiana coast, devastating the Lake Charles area. Mrs. Christman's home was hard hit and large portions of the main dwelling's tile roof blew off, resulting in substantial interior water damage. (Joint PTO at § F(9)). Hurricane Delta made landfall six weeks later, again causing widespread damage to the Lake Charles area, including to Mrs. Christman's home. (*See* Joint PTO at § F(12)).

Hurricanes Laura and Delta also occurred during the policy period, and the Estate submitted two additional claims for loss related to these storms. In an about-face, Liberty determined that the main dwelling's tile roof damage *was* compensable under the Hurricane Laura claim, and paid to have the roof replaced. (Joint PTO at

§ F(10)). In all, Liberty paid the Estate $262,157.60 under the Hurricane Laura claim,

consisting of $211,907.60 for damage to the main dwelling; $8,569.69 for damage to

other structures; $24,187.81 for damage to personal property, and $17,492.50 for loss

of use. (*Id.* at § F(11)). Later, Liberty paid the Estate an additional $55,329.61 under

the Hurricane Delta claim, for damage to the main dwelling. (*Id.* at § F(12)).

Liberty has not, however, issued any additional payments under Mrs.

Christman's original claim related to the May 26 hail storm. Accordingly, on

September 4, 2020, the Estate initiated this action in Louisiana state court, seeking

additional damages under Mrs. Christman's original hail storm claim. On October

29, 2020, Liberty removed the Estate's action to this District. (Doc. 1).

The Estate alleges that had Liberty properly adjusted Mrs. Christman's

original hail storm claim, and promptly paid to replace the main dwelling's damaged

tile roof, that roof would not have "failed" during Hurricane Laura, and the Estate

would not have suffered such devastating losses as a result of the back-to-back

hurricanes. (*See* Doc. 1-2 at ¶¶ 6-8; *see also* Doc. 9 at ¶¶ 6-8). The Estate asserts

claims for breach of the Policy *and* bad faith, each based on Liberty's denial of Mrs.

Christman's original claim to roof damage following the May 26 hail storm. (Doc. 9 at

p. 4).

A jury trial is set to begin April 11, 2022. Now Liberty moves for summary

judgment, arguing that the Estate's bad faith claim fails because "Liberty had a

reasonable and well-supported basis to partially deny coverage for [Mrs. Christman's]

alleged hail damage claim"—specifically, the Policy's wear and tear exclusion—and

therefore Liberty "did not act arbitrarily or capriciously in [denying coverage." (Doc. 40-1 at 1). Liberty further asserts that the Estate's remaining claim of breach of the Policy should be dismissed because the Estate's "rooves already have been replaced and other repairs paid for (as part of a claim for Hurricane Laura)," and the Estate is barred from obtaining additional compensation by the "double recovery" rule—*i.e.,* the Estate cannot recover twice for the same damaged roof. *Id.*

The Estate opposes Liberty's Motion in part, arguing that its bad faith claim survives because Liberty "acted arbitrarily and capriciously in denying much coverage including the roofing claims" despite receiving "clear and overwhelming evidence" that the main dwelling sustained hail damage to its roof during the May 26 storm. (Doc. 46). The Estate does not address Liberty's additional argument that the Estate's breach of the Policy claim is barred by the "double recovery" rule.

## II.   ANALYSIS

### A. Standard

Federal Rule of Civil Procedure 56 provides that the Court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the movant bears its burden of showing that there is no genuine issue of fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587. Stated differently, "[i]f the party with the burden of proof cannot

produce any summary judgment evidence on an essential element of his claim, summary judgment is required." *Geiserman v. MacDonald*, 893 F.2d 787, 793 (5th Cir. 1990).

### B. Discussion

#### 1. The Estate's Bad Faith Claim Will Be Dismissed

"The Louisiana Insurance Code imposes upon an insurer a duty of good faith and fair dealing, including 'an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured.'" *Hammerman & Gainer, LLC v. Lexington Ins. Co.*, No. 18-cv-6729, 2019 WL 2603637, at *6 (E.D. La. June 25, 2019) (Brown, C.J.) (quoting La. R.S. § 22:1973); *see also* La. R.S. § 22:1892. A plaintiff that proves an insurer's breach of its duty to adjust claims fairly and promptly—*i.e.*, an insurer's bad faith—may recover statutory penalties, including double damages, La. R.S. § 22:1973(C), and attorneys' fees and costs, La. R.S. § 22:1892. Louisiana's statutes assigning penalties for an insurer's bad faith "are penal in nature and must be strictly construed." *Gaspard v. S. Farm Bureau Cas. Ins. Co.*, 2013-0800 (La. App. 1 Cir. 9/24/14), 155 So. 3d 24, 37 (citing *Reed v. State Farm Mut. Auto. Ins. Co.*, 2003-0107 (La. 10/21/03), 857 So. 2d 1012, 1020).

A plaintiff asserting bad faith against an insurer must show that her insurer "(1) received satisfactory proof of loss, (2) failed to pay within the required time, and (3) acted in an arbitrary and capricious manner." *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 297 (5th Cir. 2009). Importantly, the Louisiana Supreme Court has repeatedly emphasized that the third element—that the insurer acted in an "arbitrary and capricious" manner—is satisfied *only* by proof that the insurer's

conduct was "vexatious." *Reed*, 857 So. 2d at 1021. Further, "'vexatious refusal to pay'

means unjustified, without reasonable or probable cause or excuse." *Id.* (quoting

*Louisiana Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.

2d 1250, 1253 (La. 1993)). Stated differently, "arbitrary and capricious" or "vexatious"

conduct describes "an insurer whose willful refusal of a claim is not based on a good-

faith defense." *See id.*

> By contrast,

> The statutory penalties are inappropriate when the insurer has a
> reasonable basis to defend the claim and acts in good-faith reliance on
> that defense. Especially when there is a reasonable and legitimate
> question as to the extent and causation of a claim, bad faith should not
> be inferred from an insurer's failure to pay within the statutory time
> limits when such reasonable doubts exist.

*Id.* (citing *Rudloff v. Louisiana Health Services and Indemnity Co.*, 385 So.2d 767,

771 (La. 1980)). To the point, "[w]hen an insurer has a good-faith reason to believe

that an exclusion bars coverage, it does not act in bad faith by not paying on the claim

and instead choosing to litigate the question of coverage." *Bellina v. Liberty Mut. Ins.*

*Co.*, No. 19-cv-13711, 2021 WL 1295018, at *7 (E.D. La. Apr. 7, 2021) (Vance, J.).

Applying these principles to the instant dispute, the Court determines that the

Estate has failed to establish a genuine dispute that Liberty's refusal to pay its initial

claim for roof damage was arbitrary and capricious, and will dismiss the Estate's bad

faith claim on this basis alone. *Geiserman*, 893 F.2d at 793 (5th Cir. 1990).

To the contrary, the summary judgment evidence shows that, at all times,

Liberty endeavored to promptly and fairly settle Mrs. Christman's original hail

damage claim. Liberty's inspector, Daniel Guilbeau inspected Mrs. Christman's

property one day after James Christman reported the loss. Mr. Guilbeau's 67-page Report observed multiple broken tiles on main dwelling's roof and, in one instance, referenced "damage *possible* from hail and/or tree limbs," but thereafter observed "[n]o damage" to the pool house's shingle roof. (Doc. 46-4 at pp. 42, 66 (emphasis added)). Liberty reviewed Mr. Guilbeau's Report and, based on these findings, plausibly concluded that the broken tiles observed on the main dwelling were caused by normal wear and tear over the roof's sixty-year lifespan. On that basis, Liberty refused coverage under the Policy's wear and tear exclusion.

Liberty communicated its denial to James Christman on June 10, just nine days after receiving Mr. Christman's claim, and fully explained the basis of its decision. Additionally, Liberty informed Mr. Christman of his right to challenge Liberty's denial of coverage, and even told him how to do so—by engaging an independent roofer to provide evidence that the broken tiles were, indeed, caused by the May 26 hail storm. Thereafter, when the Estate's roofer submitted his opinion that the roof's damage was caused by the hail storm, Liberty spent nearly one month dutifully attempting to schedule a re-inspection. Liberty's efforts were stonewalled, however, by the Estate, the Estate's roofer, and the Estate's attorney, based on unsubstantiated suspicions that Liberty's process was "fishy," and that "trying to get the same guy out on the property to get a different thing" would ultimately result in another denial. (Doc. 46-15 at pp. 143-44).

Ultimately, time ran out. Hurricanes Laura and Delta intervened before a re-inspection could occur. Even then Liberty acted reasonably, by extending coverage

under the Policy to replace the badly damaged roof.

In sum, Liberty's original refusal to extend coverage to Mrs. Christman's roof was prompt *and* fair under the Policy's wear and tear exclusion, insofar as it was based on "a reasonable and legitimate question" as to whether the alleged roof damage was caused by natural degradation of the sixty year old roof, or the May 26 hail storm. On this record, there is simply no basis to conclude that Liberty acted in bad faith. *See Reed*, 857 So. 2d at 1021; *see, e.g.*, *Bellina* (dismissing plaintiff's claims of bad faith where insurer denied hail damage claim to roof based on inspection report showing signs of "delamination and erosion/pitting consistent with long-term wear/weathering," thus providing a "good-faith reason to find that the [applicable wear and tear] exclusion barred coverage").

### 2. The Estate's Breach Of Policy Claim Will Be Dismissed

Next, Liberty argues that Plaintiff's remaining claim of breach of the Policy should also be dismissed because Liberty has now paid to replace Mrs. Christman's roof under the Hurricane Laura claim, and the "'double recovery' rule bars the Estate from "being compensated for the same damage under multiple insurance claims." (Doc. 40-1 at p. 23). Plaintiff does not respond to this argument.

Louisiana law is well settled that "[a]n insured party in Louisiana may generally 'recover under all available coverages provided that there is no double recovery.'" *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 521 (5th Cir. 2010) (quoting *Cole v. Celotex Corp.*, 599 So. 2d 1058, 1080 (La. 1992)).

> The fundamental principle of a property insurance contract is to indemnify the owner against loss, that is to place him or her in the same position in which he would have been had no accident occurred.

13

Consequently, while an insured may not recover in excess of his actual loss, an insured may recover under each policy providing coverage until the total loss sustained is indemnified.

*Id.* (quotation marks, alterations, and citations omitted).

Here, there is no dispute among the parties that Liberty "fully paid" to replace Mrs. Christman's roof as part of the Estate's Hurricane Laura claim. (Joint PTO at ¶ F(10)). Further, the parties agree that Liberty has now paid the Estate, in sum, $317,487.21 under the two hurricane claims, far exceeding Mr. McRay's original estimate of $22,340.37 to replace the main dwelling's tile roof. (Joint PTO at ¶ F(11)-(12)). On these facts—and in the absence of any argument or evidence to show that the Estate has not recovered its total loss as a result of the two hurricane claims—the Court concludes that the double recovery rule bars the Estate from obtaining any additional compensation under Mrs. Christman's original hail damage claim.

## III.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Liberty's **Motion For Summary Judgment (Doc. 40)** be and is hereby **GRANTED**.

**IT IS FURTHER ORDERED** that the Estate's claims against Liberty be and are hereby **DISMISSED WITH PREJUDICE** for the reasons set forth herein.

Judgment will be entered separately.

Baton Rouge, Louisiana, this 16th day of February, 2022

_____

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

14